ADOLPHO A. BIRCH, JR., J.,
concurring in part and dissenting in part.
*121 APPENDIX
(Excerpts from the Decision of the Court of Criminal Appeals)
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 3, 2004 Session
STATE OF TENNESSEE v. LEONARD J. YOUNG
Direct Appeal from the Criminal Court for Shelby County Nos. 00-04017, 00-04018, 00-04019 Jon Kerry Black-wood, Judge
No. W2002-03012-CCA-R3-DD-
Filed Februaiy 9, 2005
The appellant, Leonard J. Young, appeals as of right his conviction and sentence resulting from the 1999 murder of Hillary Johnson. On August 23, 2002, a Shelby County jury convicted the appellant of one count of premeditated first degree murder, one count of especially aggravated kidnapping, and one count of theft of property over $1,000.00. Following a separate sentencing hearing on August 24, 2002, the jury unanimously found the presence of three statutory aggravating circumstances: the appellant had previously been convicted of a violent felony offense, the murder was committed to avoid prosecution, and the murder was committed during the perpetration of a theft. See Tenn.Code Ann. § 39 — 13—204(i)(2), (6), (7) (Supp.2002). The jury further determined that these aggravating circumstances outweighed any mitigating circumstances and imposed a sentence of death. The trial court approved the sentencing verdict. On November 8, 2002, the trial court entered judgments of conviction sentencing the appellant to death for the murder, sixty years as a violent offender for the especially aggravated kidnapping, and twelve years as a career offender for the theft. The sentences were ordered to be served consecutively. The appellant now appeals as of right, presenting for our review the following issues: (1) whether the trial court erred by denying the appellant’s motion to suppress; (2) whether the trial court erred by failing to declare a mistrial when as a result of a death in his immediate family he was unable to continue to preside over the trial; (3) whether the evidence was sufficient to establish venue of the murder in Shelby County; (4) whether the evidence was sufficient to support the appellant’s conviction of premeditated first degree murder; (5) whether the trial court erred by permitting the State to introduce various photographs of the victim; (6) whether the trial court erred by admitting certain victim impact evidence; (7) whether the trial court’s instruction to the jury that the appellant’s prior offenses were offenses in which the statutory elements involved the use of violence violated the United States Constitution; (8) whether the evidence was sufficient to support the finding of the (i)(6) aggravating circumstance; and (9) whether Tennessee’s death penalty statutory scheme is unconstitutional. Finding no reversible error, we affirm the appellant’s convictions and sentence of death.
Tenn. R.App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.
NoRMA McGee Ogle, J., delivered the opinion of the court, in which, GaRY R. Wade, P.J., and, Thomas T. Woodall, J., joined. Robert Wilson Jones, Shelby County Public Defender; W. Mark Ward, Tony N. Brayton, and Garland Erguden, Assistant Public Defenders (on appeal); and William *122 Johnson and Diane Thackery, Assistant Public Defenders (at trial), Memphis, Tennessee, for the appellant, Leonard J. Young.
Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Wei-rich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.
OPINION
[Deleted: Guilt Phase Evidence]
[Deleted: Penalty Phase Evidence]
I. Suppression of Statement
Prior to trial, the appellant filed a motion to suppress his statements to Memphis police officers. As grounds for his motion, the appellant asserted that the statements were not given freely and voluntarily and were taken in violation of his right to counsel.
Facts Developed at the Suppression Hearing
At the suppression hearing on July 22, 2002, FBI Special Agent C.M. Sturgis testified that he interviewed the appellant on December 3, 1999, while the appellant was in custody in Oxford, Mississippi. The appellant was in custody on a warrant relating to the murder of William Bram-lett, which murder occurred in Lafayette County, Mississippi. Agent Sturgis went to Oxford to question the appellant about his involvement with or knowledge of “a missing college student, Hillary Johnson, from the University of Memphis.”
At the time of the interview, Agent Stur-gis knew that the victim’s credit cards had been used out of the state, the victim had been listed as missing by the Memphis Police Department, and the victim’s vehicle had been recovered in Tippah County, Mississippi. The appellant had been apprehended approximately four miles from where the victim’s car was recovered. The appellant had previously admitted to Memphis police officers that “he had carjacked [the victim], that he had driven out Highway 64 somewhere near the county line, meaning Fayette County[, Tennessee]. He had dropped her off at the end of a road and had proceeded on and he had left her there.” Agent Sturgis hoped that additional information could be gleaned from the appellant.
When Agent Sturgis and Agent Rine-hart arrived at the jail, they were met by Sheriff East and the attorney appointed to represent the appellant on the charges pending in Mississippi. The attorney agreed that “as long as [the agents] did not discuss [the charges pending in Mississippi] ... that it would be okay to go in if [the appellant] was willing to speak with [the agents.]” At approximately 2:00 p.m., the agents were taken to a holding area outside the appellant’s cell. Agent Sturgis testified that the area in which the appellant was confined
had three individual cells. He was in the middle cell. All of the doors were unlocked and opened and there was a common area where you could sit that had a stainless steel picnic table. There was a television mounted on the wall, a pay phone, a shower, and rest room area.
According to Agent Sturgis, the appellant “seemed to be okay. He didn’t seem like he was in any kind of health problems or miserable.... ” The agents asked the appellant if he was willing to speak with them and advised him of his rights. The appellant agreed to speak with the agents, advising them that “he had just come from *123 court on the Bramlett case” and “the judge had gone over his rights at length with him.” The appellant never indicated that he did not understand his rights or that he had trouble hearing.
Thereafter, the agents and the appellant watched television. The appellant periodically went from his cell to the picnic table where he would sit with the agents. They discussed the appellant’s carpentry skills and the fact that he had recently lost a thumb. Eventually, Agent Sturgis pulled out an envelope containing childhood photographs of the victim. He removed the photographs from the envelope and placed them on the picnic table. The agents remarked that they would like to find the victim’s body and asked the appellant if he would help them.
The three men continued their conversation, discussing the appellant’s past relationships, his education, and his prior periods of confinement. The appellant had a lengthy criminal history, spanning forty year’s. The appellant never requested an attorney and never indicated that he was tired or wanted to leave. During the interview, the appellant was served dinner and permitted to smoke a cigarette, although smoking in the jail was prohibited.
Thereafter, the appellant returned to his cell. When he returned to the table, he tapped Agent Sturgis on the chest and said, “I’m fixing to give you something.” He then proceeded to draw a map on the back of the envelope which had contained the photographs of the victim. The agents relayed the information to investigators, but the investigators were unable to find the area described by the appellant. Eventually, the appellant agreed to ride with the agents and direct them to the location of the body. They left the Oxford jail at approximately 10:30 p.m. During the drive, the appellant never indicated that he no longer wanted to help the officers locate the victim’s body or that he wanted to return to the jail. Agent Sturgis testified that when they located the body at approximately 1:20 a.m., the appellant “broke down and was very upset about what all had happened.” Although unable to recall the murder, the appellant stated that “if she was laying there dead, that he guessed he did it.” He further admitted that he had encountered the victim in midtown Memphis.
The next day, Memphis law enforcement officials contacted Agent Sturgis and inquired whether the appellant would be willing to provide a recorded written statement. Agent Sturgis offered to return to Oxford to ask the appellant if he would provide another statement.
Memphis Police Sergeant Gerald Blum testified that he and his partner, Sergeant Cox, first interviewed the appellant on November 30, 1999. The officers traveled to the Lafayette County Jail in Oxford, Mississippi, to interview the appellant as a potential suspect in the victim’s disappearance. At 1:35 p.m. that afternoon, the officers advised the appellant of his Miranda rights, which were read to him from the Memphis Police Department advice of rights form. The appellant informed Sergeant Blum that he understood his rights, but he could not read or write and, although he was willing to talk with the officers, he refused to sign anything. The appellant then told the officers that he was the person responsible for carjacking the victim. He stated that he drove the victim “out off of Highway 64 and let[ ] her out of the car.” After interviewing the appellant for more than an hour, Sergeant Blum “[tjook a break.” During the break, Agent Sturgis advised Sergeant Blum that the appellant had been positively identified as a robbery suspect in Alabama. Based upon this information, Sergeant Blum de *124 cided to question the appellant regarding the “course of [his] travels during that time.” At 6:48 p.m., Sergeant Blum resumed his questioning of the appellant and again advised the appellant of his rights. During this interview, Sergeant Blum asked, “[I]f we find Ms. Johnson’s body and it’s determined there was foul play involved, who would be responsible and he said only me.” The appellant also admitted to taking the victim’s vehicle and traveling through several southern states. The second part of the interview concluded at 9:50 p.m.
Sergeant Blum recalled that during the interview, the appellant did not appear to be under the influence of any drugs or alcohol. Sergeant Blum also stated that neither he nor anyone in his presence threatened, coerced, or made promises to the appellant. Moreover, the appellant never requested an attorney. However, the appellant informed the officers that he had completed only the third grade and could not read or write.
Sergeant Blum testified that on December 4, 1999, he returned to Oxford to question the appellant. Sergeant Blum was taken to an interview room where the appellant’s statement was to be tape recorded. The appellant was again advised of his rights and, this time, the appellant signed the advice of rights form. According to Sergeant Blum, the appellant appeared to be in good condition, calm, cooperative, and not under the influence of any drugs or intoxicants. During the interview, the appellant did not indicate that he wanted to terminate the interview or that he wanted counsel. The interview lasted approximately one hour.
In his recorded statement, the appellant admitted that while “runnin’ from the law out of Mississippi,” he stole the Bronco and drove through Memphis to Houston, Texas, and back to Memphis. While in Memphis, he visited his niece, who informed him that the police were looking for him. Thereafter, the appellant parked the Bronco on the street near his niece’s apartment in midtown and “started wal-kin’.” As he walked across the street, a girl in a white, four-door car stopped and asked the appellant a question. The appellant jumped in the passenger side of the vehicle and told the girl that he “wasn’t gonna hurt her, all [he] needed was a way to get out of Shelby County.” The appellant related that when he jumped into the car, he had two guns in his boots, one of which was the nine-millimeter pistol taken from the Bronco.
The appellant stated that after driving several blocks, he and the victim “switched places,” and he drove “east ‘till we got to Airways. When we got to Airways, I knowed where I was at then. We went to Airways around to [Interstate] 240. I went around Memphis to [Interstate] 40 going to Nashville and hit [Highway] 64 while I was going out that way.” The appellant stated that he “dumped [the victim] off out there in Shelby County and ... hid her body under some tin.”
In his statement, the appellant claimed that although he was responsible for the victim’s death, he was unable to recall how she died. However, he related that while “in the woods,” the victim pulled a knife from behind the seat. He grabbed her arm and took the knife from her. The appellant stated, “I think she got cut.” The appellant then dragged the victim’s body to a field and placed her under “some tin.” After hiding the victim’s body, the appellant took her car and drove to Alabama, Florida, and back to Mississippi. He used the victim’s credit cards to finance his trip.
The fifty-seven-year-old appellant testified at the suppression hearing that he had *125 completed only the first grade. When he was twelve years old, he was placed in a school for boys, but was subsequently forced to leave because his father needed him to work in the fields. The appellant testified that he could not read or write. He related that while in the Lafayette County Jail he was questioned by approximately sixteen or eighteen law enforcement officers within a five-day period. According to the appellant, the officers failed to identify themselves and questioned him “[d]ay and night, day and night.” The appellant maintained that during the interview process, he was threatened physically by a Memphis police officer and was confined to his cell. When taken to the “sally port” to smoke a cigarette, the appellant was placed in leg irons, handcuffs, and waist chains and guarded by “attack dogs.”
The appellant conceded that he understood some of the rights that were read to him; however, he was unable to recall signing the advice of rights form. In fact, he maintained that he “ain’t signed nothing.” The appellant claimed that during the interview, he advised the officers that he was finished speaking with them, but the interview continued. The appellant also claimed that when he requested an attorney, Sheriff East brought an attorney to the door and said, “[T]his is the attorney we are going to appoint you.” The appellant testified that “the man left and I ain’t ever seen him since, not nary time since then.” Regarding his alleged cooperation, the appellant stated, “I tried to be as [cooperative as] I could ... to keep from getting the hell beat out of me.” The appellant further averred that he never agreed to physically direct the officers to the location of the victim’s body. Rather, he was chained and placed in a patrol car. According to the appellant, the trip to Tennessee and then to Mississippi was without his consent. On cross-examination, the appellant admitted that he had prior convictions of robbery with a deadly weapon, rape, crime against nature, grand larceny, kidnapping, habitual criminal, and manslaughter.
Based upon this proof, the trial court made the following findings of fact and conclusions of law:
[T]here is ample proof in my judgment that the FBI Agents Sturgis and Rine-hart gave Mr. Young his rights. Even Mr. Young conceded in his testimony, his sworn testimony today that he was advised of his rights orally. He does not remember them actually reading from a document the rights, but he does remember having been advised of his rights and concedes that he understood most of them.
We didn’t get into or the questioning didn’t get into exactly what he claims he did not understand but he concedes that he understood most of them. That’s from his testimony. Certainly from the testimony of the agents, he was fully advised of his rights and appeared to fully understand his rights prior to giving the oral statements that they took from him and prior to going with them up to Tennessee and the continuing statements that he provided in helping them locate the body. So I don’t have any qualms about determining that he had been fully advised of his rights by the FBI agents prior to cooperating with them, giving them the oral statements that he gave and the statements that he gave in the process of helping to locate the body.
In fact, the whole history of the statements that he gave would indicate a pattern of cooperation, a pattern of initially giving self-serving statements that then evolved into more incriminating statements. He first told the police *126 even before the agents went down there that he had kidnapped the victim but had let her out at that intersection on Highway 64. And last time he saw her she was alive. That was his initial statement. So that would indicate a self-serving statement that would certainly indicate a statement freely and voluntarily given.
And of course, when trying to view what Mr. Young is now claiming happened against what the officers claim happened, one has to evaluate the credibility of the various witnesses, and I find Mr. Young’s credibility not to be very good given his prior record and the motive he would have today to shade things in his favor.
With regard to whether he was advised of his rights by Officer Blum and whether he freely and voluntarily gave the statement to the Memphis Police Department, again, he was advised of his rights first on November 30 at 1:35 p.m. That was the time that he was read his rights but refused to sign. That’s consistent with all that was presented. And then again on December 4th, when he was read his rights and did sign. Then provided the lengthy taped statement. There are several indications at the beginning — the tape itself has not been introduced into evidence, but the statement indicates that in the heading it was stated that this taped statement is made on Saturday, December 4th, 1999, in the Fayette County jail, Fayette County, Mississippi. I assume that means LaFayette County, 1611 hours to Sergeant Blum and Sergeant Cox.
Farther down that first page, Question: Mr. Young, are you aware that we are recording this tape? Answer: Yes. Second page — well, after his rights are read to him again, they ask him: If you don’t mind speaking up and saying yes instead of shaking your head. Answer: Yes. Which would again indicate that he knew it was being taped. And then later in the statement where Sergeant Blum indicates that he’s turning the tape over to side B and asking Mr. Young to repeat his answer, would further indicate that he knew that the matter was being taped. I don’t think it’s any question. He knew it was being taped. He was freely and voluntarily giving the statement.
In fact some of his answers, some of his responses — all of his responses in here would indicate an individual who was cooperating and freely and voluntarily giving the statement. And as an example, of course I had noticed the portion ... where he said he wanted to apologize for giving the police a hard time the other day. That would certainly indicate an individual who was not being coerced to say anything but was voluntarily cooperating and giving the statement.
And then on Page 17 where he was asked: Why did you decide to take them to that location? Answer: I wanted her to be with her family for Christmas and get this over with. It was eating me up. It was eating me alive.
To me that indicates a person that’s voluntarily providing this information, has a real, an overwhelming feeling of guilt. It was eating me up. It was eating me alive. He wants to unburden himself and provide this information and does not indicate an individual who is being coerced or beaten or forced in anyway to give this statement.
I think everything about the testimony I’ve heard and the documents that have been introduced suggest that all these statements and all these actions were provided freely and voluntarily af *127 ter he had been fully advised of his rights on numerous occasions. And I’ll deny the motion to suppress in every regard.
On appeal, the appellant contests the trial court’s denial of his motion to suppress, arguing that his testimony reflects that his confession was coerced and that his request for counsel was never honored. The State responds that the trial court properly denied the appellant’s motion to suppress.
A defendant’s right against compelled self-incrimination is protected by both the United States and Tennessee Constitutions. U.S. Const, amend. V; Tenn. Const, art. I, § 9. As our supreme court has explained:
In Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.
State v. Blackstock, 19 S.W.3d 200, 207 (Tenn.2000). However, these rights protected by Miranda may be waived by an accused if the waiver is made voluntarily, knowingly, and intelligently. Id. Whether a waiver has been made voluntarily, knowingly, and intelligently must be determined by the totality of the circumstances surrounding the interrogation. State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn.1993); State v. Benton, 759 S.W.2d 427, 431-32 (Tenn.Crim.App.1988).
The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates otherwise. State v. Ross, 49 S.W.3d 833, 839 (Tenn.2001) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996)). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. Odom, 928 S.W.2d at 23. On appeal, the prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. State v. Hicks, 55 S.W.3d 515, 521 (Tenn.2001). The trial court’s application of the law to the facts, however, is subject to de novo review. State v. Daniel, 12 S.W.3d 420, 423 (Tenn.2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. State v. Buck, 670 S.W.2d 600, 610 (Tenn.1984).
In the instant case, the trial court accredited the testimony of Memphis Police Sergeant Gerald Blum and the FBI agents and found that the appellant had not been coerced into giving his statements. The trial court noted that Sergeant Blum testified, and the appellant conceded, that he had advised the appellant of his rights prior to questioning on both November 30, 1999, and December 4, 1999. The trial court further noted that although the appellant refused to sign a waiver at the interview on November 30, 1999, he subsequently executed a written waiver on December 4, 1999, and provided a “lengthy taped statement.” The transcribed statement reflects that the appellant was advised of his rights, claimed that he under *128 stood his rights, and acknowledged that he was aware that his statement was being recorded on audiotape. Moreover, contrary to the appellant’s testimony, both Sergeant Blum and Agent Sturgis testified that the appellant never requested an attorney. Although the appellant had a limited education, he had a history with the criminal justice system that spanned forty years. Based upon these facts and circumstances, the trial court found that the appellant was “cooperative and freely and voluntarily g[ave] the statement[s].” The evidence does not preponderate against the findings of the trial court. Accordingly, we conclude that the trial court committed no error in denying the appellant’s motion to suppress.
[Deleted: II. Failure of Trial Court to Declare Mistrial]
III. Venue
Next, the appellant contends that the evidence was insufficient to establish Shelby County as the proper venue for the prosecution of the victim’s murder.[1] Specifically, the appellant argues that the State failed to present evidence that the killing occurred in Shelby County, noting that the victim’s body was discovered in a field in Fayette County. The appellant also contends that the trial court erred by failing to instruct the jury on the issue of venue. The State maintains that because the element of premeditation was committed in Memphis, Shelby County was the proper venue.
[Deleted: A. Sufficiency]
B. Instruction
Contrary to the appellant’s assertion, the trial court provided the following instruction relative to venue:
It is therefore incumbent upon the state before you convict the defendant to establish, to your satisfaction beyond a reasonable doubt, that the crime charged in the indictment has been committed, that the same was committed within the county of Shelby and the state of Tennessee before the finding and returning of the indictment and that the defendant at the bar committed the crime in such a manner that would be make him guilty under the law heretofore defined and explained to you.
(Emphasis added). While this instruction is materially different from the pattern jury instruction found at T.P.I.-Crim. No. 2.05,[2] the instruction provided that the jury had to find that the offense occurred in Shelby County, Tennessee. The instruction erroneously elevated the State’s burden of proof to that of “beyond a reasonable doubt”; thus, any error by the trial court inured to the appellant’s benefit. Moreover, because the appellant failed to *129 object to the jury instruction and failed to request any special instructions on the issue of venue, even though, as the appellant asserts, the lack of venue was one of his theories of defense, the issue is waived. See Tenn. R.App. P. 36(a). Finally, we note that the mere meagerness of an instruction does not constitute reversible error in the absence of a special request for an additional instruction. See State v. Haynes, 720 S.W.2d 76, 85 (Tenn.Crim. App.1986) (citing State v. Rollins, 605 S.W.2d 828, 832 (Tenn.Crim.App.1980)). Accordingly, the appellant is not entitled to relief on this ground.
[Deleted: IY. Sufficiency of the Evidence]
V. Introduction of Photographs of the Victim
[Deleted: A. Childhood Photographs]
B. Autopsy Photograph
The appellant also challenges the admission of the autopsy photograph of the victim. At trial, the trial court admitted the photograph over defense counsel’s objection, finding:
the photograph is not one of the — it’s with her face down, although it contains bruising and what appears to the court to be bruising. It’s not — she is clothed with the exception of the area above her — by her shoulders. It shows one stab wound. The court finds nothing really gruesome in the photograph.
Assuming that Dr. Smith is going to testify that this is the wound that caused the death, it would be illustrative of the wound and would be probative as to his expert opinion as to what caused her death.
On appeal, the appellant argues that the trial court should have excluded the photograph because it was gruesome and not probative of any contested issue in the case. The appellant further argues that any probative value was substantially outweighed by the danger of unfair prejudice. According to the appellant, the medical examiner’s testimony and an x-ray depicting the knife blade embedded in the victim’s chest were sufficient to illustrate the mortal wound. The State maintains that the photograph established premeditation, corroborated the testimony of the medical examiner, and proved the victim’s death as well as the manner in which she died. The State also argues that because the photograph was not particularly gruesome or horrifying, the appellant was not unfairly prejudiced. We agree with the State.
Generally, “photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding them gruesome and horrifying character.” Banks, 564 S.W.2d at 950-51. Moreover, photographs can be relevant if they aid the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn.1997) (holding that photographs were relevant to supplement the testimony of the medical examiner and investigative officers in showing the cause of death and the violence of the attack). However, the probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence. Banks, 564 S.W.2d at 951.
We conclude that the admission of the photograph in the instant case was not error. The photograph in question depicted the victim’s body face-down on a table at the morgue. The stab wound can be seen in the upper left portion of her back; thus, the photograph was relevant to supplement the testimony of the medical examiner in establishing the cause of death. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn.1994). Although the photo *130 graph showed extensive bruising to the victim’s upper back, the photograph was not particularly gruesome. Moreover, the photograph did not show the victim’s body to be in an altered condition due to the autopsy. Accordingly, we are unable to conclude that the trial court abused its discretion in ruling that the probative value of the photograph in question was not substantially outweighed by the risk of unfair prejudice. This claim is without merit.
[Deleted: YI. Admission of Victim Impact Evidence]
[Deleted: VII. Instruction as to (i)(2) Aggravator]
[Deleted: VIII. Sufficiency of (i)(6) Aggravating Circumstance]
IX. Constitutionality of Tennessee Death Penalty Scheme
Next, the appellant raises numerous challenges to the constitutionality of Tennessee Code Annotated sections 39-13-204 and 39-13-206 under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution. Specifically, the appellant argues that (A) Tennessee’s death penalty statutes fail to meaningfully narrow the class of death eligible defendants; (B) the death sentence is imposed capriciously and arbitrarily; and (C) the appellate review process in death penalty cases is constitutionally inadequate.
A. Failure to Meaningfully Narrow the Class of Death Eligible Defendants
The appellant argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-2-204(i)(2), (i)(5), (i)(6), and (i)(7), individually and collectively, “have been so broadly and disparately interpreted that they fail to provide a ‘meaningful basis’ for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.” As the State correctly notes, factor (i)(5) does not pertain to this case as it was neither relied upon by the State nor found by the jury. Thus, any individual claim with respect to this factor is without merit. See, e.g., State v. Hall, 958 S.W.2d 679, 715 (Tenn.1997); State v. Brimmer, 876 S.W.2d 75, 86 (Tenn.1994). Moreover, the appellant’s argument with regard to factors (i)(2), (i)(6), and (i)(7) has previously been rejected by our supreme court. See State v. Vann, 976 S.W.2d 93, 117-18 (Tenn.1998) (Appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn.1994).
B. The Death Sentence Is Imposed Capriciously and Arbitrarily
Next, the appellant argues that the death sentence is imposed capriciously and arbitrarily because (1) unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty; (2) the death penalty is imposed in a discriminatory manner based upon race, geography, and gender; (3) the jury is required to unanimously agree to a life verdict in violation of McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); and (4) the failure to instruct the jury on the meaning and function of mitigating circumstances results in the reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances. Our supreme court has rejected each of these arguments. See State v. Hines, 919 S.W.2d 573, 582 (Tenn.1995); Brimmer, 876 S.W.2d at 87; State v. Cazes, 875 S.W.2d 253, 268 (Tenn.1994); State v. Smith, 857 S.W.2d 1, 23 (Tenn.1993); State *131 v. Thompson, 768 S.W.2d 239, 250-52 (Tenn.1989).
C. The Appellate Review Process in Death Penalty Cases Is Constitutionally Inadequate
Finally, the appellant contends that the appellate review process in death penalty cases is constitutionally inadequate. Specifically, the appellant contends that the review process is not “meaningful” and that the statutorily mandated proportionality review violates due process. Both arguments have been rejected by our supreme court. See Vann, 976 S.W.2d at 118-19; Cazes, 875 S.W.2d at 270-71. Moreover, the supreme court has held that, “[wjhile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required.” State v. Bland, 958 S.W.2d 651, 663 (Tenn.1997).
[Deleted: X. Review Pursuant to Tennessee Code Annotated Section 39 — 13—206(c)3
XI. Conclusion
Having fully reviewed the record and the applicable authority, we affirm the appellant’s conviction of first degree murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39 — 13—206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude that the sentence of death was not imposed arbitrarily and that the evidence supports the jury’s finding of the statutory aggravating circumstances and the jury’s finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. See Tenn.Code Ann. § 39-13-206(c)(l)(A)-(C). Moreover, a comparative proportionality review, considering both “the ñatee of the crime and the defendant,” convinces us that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.
NORMA MCGEE OGLE, JUDGE

. On appeal, the appellant does not challenge the venue in Shelby County for the offenses of theft of property over $1,000 and especially aggravated kidnapping.

. Tennessee Pattern Jury Instruction 2.05 provides:
The burden is upon the state to prove by a preponderance of the evidence that this offense was committed in [_] County, Tennessee.
Proof by a preponderance of the evidence means that the greater weight of the evidence must be in support of the state's contention.
Venue of the offense lies in the county where the offense was commenced or consummated.
If you find that the state has failed to prove by a preponderance of the evidence that this offense was commenced or consummated in [_] County, Tennessee, then you must return a verdict of not guilty.